**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Sandra K. Renschler, | ) | **ORDER DENYING PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY** |
| Plaintiff, | ) | **JUDGMENT; GRANTING** |
| | ) | **DEFENDANT'S MOTION FOR** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Carolyn W. Colvin, Acting Social Security | ) | |
| Administration Commissioner, | ) | Case No. 1:12-cv-052 |
| | ) | |
| Defendant. | ) | |

Plaintiff Sandra K. Renschler seeks judicial review of the Social Security Commissioner's ("Commissioner") denial of her application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-434. This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

I.      **BACKGROUND**

     A.      **Procedural history**

On August 21, 2008, Renschler protectively filed an application for DIB, alleging disability due to systemic lupus erythematosus ("SLE") with inflammatory polyarthropathy with an alleged onset date of September 2, 1999. (Tr. 64, 117-118, 159). Her date last insured under the Act was March 31, 2001. (Tr. 15, 155). Her claim was denied initially and upon reconsideration. (Tr. 64-74). She requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 21, 2010. (Tr. 21, 75). Renschler appeared and testified at the hearing and was represented by counsel. (Tr. 21-63).

On January 13, 2011, the ALJ issued a written opinion denying the claim at step two of the required five-step sequential analysis, concluding that Renschler did not have a severe impairment

or combination of impairments that significantly limited her ability to work as of her date last insured. (Tr. 13-20). Renschler requested review of the ALJ's decision by the Appeals Council. (Tr. 5-8). On March 13, 2012, the Appeals Council denied the request for further review and adopted the ALJ's decision as the Commissioner's final decision. (Tr. 1-4). On May 11, 2012, Renschler commenced this action, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Docket No. 1). The parties have filed summary judgment motions that have been fully briefed and are ripe for review. Both parties consented to disposition by a magistrate judge.

### B. Factual background

#### 1. Renschler's personal data, work history, and DIB application

Renschler was born in 1969. She was 29 years old on the alleged onset date, 38 years old when she first applied for DIB, and 41 years old on the date of her administrative hearing. She has been married since 1995 and has three children who, at the time of the administrative hearing, were seventeen, twelve, and eleven years old. (Tr. 26). She earned a bachelor's degree in social work in 1995 and was a licensed social worker from 1995 to 2008. (Tr. 28, 166).

Renschler has been employed as a cashier, a nurse aide, a daycare provider, and a social worker. She worked approximately 32 hours per week as a grocery store cashier from 1989 to 1990 and approximately 20 hours per week as a nurse aid from 1990 to 1993. (Tr. 160, 168). From 1995 to 1996, she operated a home daycare where she cared for approximately three to four children, including her own. (Tr. 150). From 1996 until August 1999, she worked approximately 20 hours per week as a child advocate social worker for the Abused Adult Resource Center. (Tr. 34, 160). After leaving that position, she again opened a home daycare where she cared for one or two

2

children in addition to her own. (Tr. 30, 171-72). Renschler operated the home daycare until 2008. (Tr. 30). In addition, from September 2007 to October 2007, she worked approximately three eight-hour overnight shifts per week at Kohl's department store. (Tr. 30-31, 188-89). She was not working at the time of her administrative hearing. (Tr. 32).

Renschler was diagnosed with SLE in January 2008 and subsequently applied for DIB in August 2008. (Tr. 41-42, 117-19, 315-23). In her DIB application, Renschler stated she was disabled due to her SLE and described her disability as follows:

> I have extreme fatigue. Major joint problems especially in hands and knees, writing and typing is impossible to do for very long. Trouble bending over, standing for long periods. I have to sit and take naps. I'm not supposed to lift things or anything to exert myself. Affects my ability to remembering and being able to say what I am thinking. Can't pull words out of my head.

(Tr. 159). Renschler alleged that she became unable to work due her disability on September 2, 1999. (Tr. 117). In order to qualify for DIB, Renschler must have been disabled by March 31, 2001, her date last insured.

### 2.     Renschler's medical records

#### a.     Prior to the alleged onset date of September 2, 1999

In May 1999, Renschler saw Dr. Jeffrey Orchard and was treated for a sore throat and minor cough. (Tr. 397).

#### b.     Between the alleged onset date of September 2, 1999 and the date last insured of March 31, 2001

In October 2000, Renschler saw Dr. Jim Dungan and was treated for breast tenderness. Dr. Dungan noted that Renschler had been breast feeding for approximately two years with two different children, diagnosed a plugged mammary duct, and recommended that Renschler continue breast feeding, apply warm packs to treat her pain, and return if her symptoms continued. (Tr. 395-96).

In January 2001, Renschler saw Dr. John Witt for an annual exam. At that time, Renschler was 5 feet 2 inches tall, and weighed 171 pounds. Dr. Witt noted Renschler's desire to lose weight and prescribed a new method of birth control. After documenting these two items, Dr. Witt's notes state, "The patient's questions are all answered. She has no other complaints or concerns that she wishes to talk about at this time." (Tr. 393-94).

### c. Following the date last insured of March 31, 2001

In May 2001, Renschler saw Dr. Shelly Seifert for headaches. Dr. Seifert noted that Renschler reported that the frequency of her severe headaches had increased from approximately five per year since her twenties to at least ten to that point in 2001. She prescribed Indocin for the headaches, noted that Renschler's blood pressure was elevated, and recommended that Renschler monitor her blood pressure and return for a checkup in two to three months. (Tr. 391-92). In October 2001, Renschler saw Dr. Seifert for abdominal pain. Dr. Seifert ran a complete blood count and urinalysis that came back normal, determined Renschler was likely experiencing menstrual pain, directed Renschler to return if the pain did not improve, and ordered a thyroid stimulating hormone test which returned within normal range. (Tr. 389-90, 439).

In May 2002, Renschler saw Dr. Seifert for an annual exam. At that time Renschler weighed 179 pounds, which she reported was the most she had ever weighed, including during her pregnancies. Renschler reported experiencing a number of symptoms, including hot flashes that started after she had her first child in 1998, dizziness upon bending over, fatigue, multiple aches and pains, and symptoms she associated with anxiety and depression. Dr. Seifert noted that "Patient has not felt well. She complains of hot flashes and fatigue and multiple aches and pains. She has had weight gain as described." (Tr. 387). Dr. Seifert ordered several lab tests, prescribed Renschler

Indocin for migraines and Zoloft for anxiety, recommended that she exercise, and directed her to return in approximately six to eight weeks. (Tr. 385-88). In August 2002, Renschler saw Dr. Seifert for a recheck on the Zoloft. Renschler reported that her anxiety improved when she began taking the Zoloft and reported that she continued to experience hot flashes, dizziness, chest pain, and frequent headaches. Dr. Seifert noted that Renschler's blood pressure remained elevated, refilled her Zoloft prescription, prescribed Elavil for headaches, and directed her to exercise. (Tr. 382-84).

In January 2003, Renschler saw Family Nurse Practitioner Kristin Chaussee to discuss weight loss. Renschler weighed 182 pounds at the time of the visit and was provided with a weight management program that included diet changes and exercise. (Tr. 380-81). In February 2003, Renschler saw Dr. Witt for a second visit for her weight management program. She weighed 178 pounds. (Tr. 379). In May 2003, Renschler saw Dr. Witt and Chaussee for her third visit on the weight management program. Renschler reported that she "felt extremely fatigued and can hardly get off the couch at times, is taking naps during the day which is very abnormal for her." (Tr. 378). Dr. Witt ordered hemoglobin, mono, and thyroid simulating hormone tests, all of which came back normal, and recommended that Renschler continue with the weight management plan and follow up in approximately one month. (Tr. 378).

In August 2003, Renschler saw Dr. Seifert for treatment of dizziness that had lasted for approximately 24 hours. She weighed 189 pounds. Dr. Seifert directed Renschler to taper off her antidepressant, ordered a complete blood count and an expanded metabolic panel, directed Renschler to return if her symptoms persisted or worsened, and indicated Renschler would be contacted if any of her lab results were abnormal. (Tr. 376-77). In October 2003, Renschler saw Dr. Seifert for a bladder infection and was prescribed an antibiotic and an antifungal tablet. (Tr. 375). In December

2003, Renschler saw Dr. Seifert for a complete physical. She reported continued anxiety as well as pain in her feet and right knee. Dr. Seifert noted, "The patient just doesn't feel well. She is fatigued a lot of the time. She has various aches and pains. Chart review shows that her weight continues to climb. She is now up to 201 pounds. In May of last year she weighed 179 pounds." (Tr. 373). Dr. Seifert prescribed an antidepressant, determined that Renschler's foot pain could be due to plantar fasciitis, provided Renschler with physical therapy treatments that could improve the condition, and directed Renschler to attempt to lose weight through diet and exercise. (Tr. 372-74).

In January 2004, Renschler saw Dr. Seifert for treatment after she cut her finger. (Tr. 371).

In May 2005, Renschler saw Dr. Seifert for treatment of an upper respiratory infection and enlarged lymph nodes behind her right ear. Dr. Seifert discussed Renschler's elevated blood pressure and encouraged her to lose weight. (Tr. 369-70). Approximately one week later, Renschler saw Dr. Louise Murphy for an annual exam. Dr. Murphy noted the exam was unremarkable with the exception that Renschler was overweight, ordered a thyroid panel to determine whether Renschler's weight gain and fatigue could be related to hypothyroidism, and recommended that Renschler return in approximately one month to recheck her hemoglobin and blood pressure. (Tr. 366-68). In July 2005, Renschler saw Dr. Murphy for a blood pressure recheck and reported fatigue and a sore throat. Dr. Murphy noted that Renschler's recent hemoglobin and thyroid tests were within normal limits, increased the dosage of her antidepressant, prescribed a blood pressure medication, recommended that she try Claritin for her sore throat, recommended that she reduce her intake of alcohol and caffeine and exercise more frequently, and directed her to return for a recheck of her blood pressure, fatigue, and sore throat in approximately four to six weeks. (Tr. 364-65). In September 2005, Renschler saw Dr. Murphy for a blood pressure recheck and reported sinus

congestion. Dr. Murphy noted that Renschler's blood pressure was normal and prescribed a course of treatment for her sinus symptoms. (Tr. 362-63).

On October 3, 2005, Renschler saw Dr. Robert Roswick for a cough that had persisted for approximately three weeks. Dr. Roswick determined Renschler likely had bronchitis and prescribed Zithromax. (Tr. 359). Renschler sought treatment for her cough from Dr. Douglas Moen on October 14, 2005, and from Dr. Murphy on November 15, 2005. (Tr. 356-58). On November 16, 2005, Renschler saw Dr. Darwin Lange for her cough and was prescribed a course of treatment. (Tr. 257). On December 7, 2005, Renschler saw Dr. Lange for a recheck of her cough, which had resolved. Dr. Lange advised that she continue to use Singulair and a rescue inhaler and ordered a pulmonary function test, which showed normal lung function. (Tr. 256, 286).

On December 29, 2005, Renschler saw Dr. Lange for swollen hands and feet. He prescribed a blood pressure medication, ordered a thyroid-stimulating hormone test, a complete blood count, a metabolic panel, a sedimentation rate test, and a c-reactive protein test, encouraged Renschler to exercise, and recommended that she return in four to six weeks. (Tr. 254). The tests showed slightly elevated inflammatory markers. (Tr. 253, 281, 283). In February 2006, Renschler saw Dr. Lange for continued swelling and stiffness in her hands and feet. He ordered tests for sedimentation rate, c-reactive protein, rheumatoid arthritis, and antinuclear antibody ("ANA"). The tests showed elevated inflammatory markers and were positive for ANA. Dr. Lange referred Renschler to Dr. Lynne Peterson to evaluate the results. (Tr. 253, 273-78).

On March 22, 2006, Renschler saw Dr. Lynne Peterson for evaluation of her persistent cough, joint pain, and positive ANA. Renschler reported that she had experienced joint pain for approximately six years and thought the pain had worsened in the last year. Dr. Lynne Peterson

concluded that Renschler's hand pain was likely median neuropathy or carpal tunnel syndrome and that her foot pain was likely related to plantar fasciitis. Dr. Lynne Peterson ordered several lab tests and a CT scan and referred Renschler to a physical therapist for an orthotic evaluation. (Tr. 250-52). On March 27, 2006, Renschler saw Dr. Lange for a recheck, Dr. Gregory Peterson for further testing of carpal tunnel syndrome, and Dr. Lynne Peterson, who performed a steroid injection to both of Renschler's wrists. (Tr. 247-49). On April 4, 2006, Renschler saw physical therapist Jeff Wetzel for plantar fasciitis and was instructed to perform stretches and ice massage, to wear orthotic inserts, and to return for a recheck in approximately one week. (Tr. 244-45). On April 19, 2006, Renschler saw Wetzel and reported that her pain was worse than at her previous visit. Wetzel used phonophoresis and deep tissue massage during the visit and directed Renschler to continue stretching, icing, and wearing the orthotics and to begin to attend physical therapy twice per week. (Tr. 243). Renschler saw Wetzel for physical therapy on May 2, May 4, and May 11, 2006, and reported that her pain continued. (Tr. 237-42). In August 2006, Renschler saw Dr. Lynne Peterson for a second steroid injection in her wrists. (Tr. 236). In November 2006, Renschler saw Dr. Lange for an annual exam. (Tr. 235).

In January 2007, Renschler saw Dr. Dale A. Klein for a sore throat and was treated for sinusitis. (Tr. 234). In February 2007, Renschler saw Dr. Lange for a sore throat and cough and was treated for bronchitis. (Tr. 233). On July 8, 2007, Renschler saw Dr. Donald J. Kosiak and was treated for a cough, shortness of breath, sore throat, ear pain, headache, and fatigue. (Tr. 232). On July 13, 2007, Renschler saw Dr. Seifert for a blood pressure recheck. Dr. Seifert noted, "The patient has a bunch of symptoms that she thinks are due to her high blood pressure. She feels extremely fatigued. She feels like just sleeping all of the time. She does not have any energy. She

feels short of breath at times. Upon questioning this is sounding more like an anxiety type of situation." (Tr. 355). Dr. Seifert ordered a thyroid simulating hormone test and an expanded metabolic panel, changed Renschler's antidepressant, and directed Renschler to return in approximately one month. (Tr. 354-55, 360-61). The metabolic panel showed elevated transaminases. (Tr. 353, 426). In October 2007, Renschler saw Dr. Seifert for a blood pressure recheck and a liver panel, as the elevated transminases indicated possible liver function issues. Renschler reported the new antidepressant was controlling her anxiety and depression to her satisfaction and was directed to return to discuss the results of the liver panel in approximately one month. (Tr. 353). In November 2007, Renschler saw Dr. Seifert to discuss the results of her liver panel which was positive for ANA and anti-Smith antibody. Dr. Seifert referred Renschler to Dr. Prashant Kaushik for evaluation of the results. (Tr. 351-352, 404).

In January 2008, Renschler saw Dr. Kaushik, who determined the most plausible diagnosis was systemic lupus erythematosus and prescribed a course of treatment. (Tr. 315-23). Following her SLE diagnosis, Renschler continued to seek treatment for her SLE symptoms and elevated blood pressure. (Tr. 288-314, 342-50, 459-64).

### d. Psychological evaluation and state agency consultant opinions

In February 2009, Renschler was referred to a licensed clinical psychologist for memory testing and a mental status examination to aid in evaluation of her DIB claim. (Tr. 467-70). The evaluating psychologist concluded that Renschler's scores on the tests administered were consistent with average to above-average memory and a mild level of depressive symptoms and diagnosed Renschler with "Adjustment Disorder with Depressed Mood, chronic." (Tr. 469-70). The psychologist further opined that:

While Sandra's memory functioning appears to range from average to well above average, she may perceive her areas of average functioning as low, in comparison to her prior levels of functioning, which possibly may have been more consistently above average, as suggested by her very high GPA's in high school and college. Sandra's mild level of depression may be a contributing factor to occasional concentration difficulty, which could in turn adversely affect her free recall of information at times. Nevertheless, test results suggest that Sandra's delayed visual memory is very good, and that with prompting, Sandra's auditory memory is excellent. Her prognosis is regarded as good, provided she is able to manage her physical conditions effectively.

(Tr. 470).

In April 2009, Renschler's records were reviewed by a state agency physician, Dr. Marlin Johnson, and a state agency psychologist, Dr. Harold Hase. Dr. Johnson concluded there was insufficient evidence to determine that Renschler had a severe impairment between the alleged onset date and her date last insured and completed a physical residual functional capacity assessment. (Tr. 471-73, 502-09). Dr. Hase concluded that there was insufficient evidence to determine whether Renschler had a medically determinable impairment between the alleged onset date and the date last insured and that from August 1, 2008 to the date of the assessment, Renschler had a non-severe medically determinable impairment described as adjustment disorder with depressed mood. (Tr. 474-501).

Later in April 2009, the assessments completed by Dr. Johnson and Dr. Hase were reviewed by medical consultants. Dr. Mark Dilger disagreed with some of the particulars of Dr. Hase's assessment but concluded that Disability Determination Services' initial decision denying benefits was reasonable given the medical evidence of record. (Tr. 510-15). Dr. Kimberly Terry agreed with Dr. Johnson's residual functional capacity assessment. (Tr. 516-17). In July 2009, the previous assessment of Renschler's medical impairments was reviewed by Dr. Curtis Juhala, who affirmed the assessment as written, and the previous assessment of Renschler's mental impairments was

reviewed by Dr. Albert Samuelson, who affirmed the assessment as written.  (Tr. 518-23).

### C.      <u>Administrative hearing and ALJ decision</u>

Renschler and her mother, Mary Nicholson, testified at the hearing.  A vocational expert, Thomas Audet, was available by telephone but did not testify.  The ALJ also considered a letter submitted by Renschler's sister.

During examination by the ALJ, Renschler testified that prior to March 2001, she had difficulty focusing.  When asked whether that was difficulty concentrating or difficulty focusing her eyes, Renschler stated she had problems with both.  Renschler stated that she had difficulty concentrating in 2001 but did not tell her doctor and that she could not remember when she started having difficulty focusing her eyes.  Renschler stated that prior to 2001, she was unable to write for more than about 20 minutes without experiencing pain and that she believed she reported that problem to her doctor.  Renschler also stated that in 2001, she was able to do simple math and manage her household finances.

During examination by her attorney, Renschler elaborated upon why she left her job as a social worker:

> Q.      In 1999, Sandy, when you left your work at the AARC, what was your reason for leaving that work?  Why did you feel you were no longer able to do that?
>
> A.      I just didn't have the energy to continue.  I also had three children at home. I, I didn't have the ability to concentrate on what I was doing.  I knew it was not beneficial for myself or for the employment I was at to stay.
>
> Q.      Were you having difficulties in your employment that your employer saw, that the people at AARC saw, that, that caused you to leave?  I mean, did they see what kinds of problems you were having?
>
> A.      I know I had complained about my hands hurting when I was writing, or computing, or — I had difficulty going up and down the stairs.  There was a big area of stairs to get to my office at the top floor.  I'd be out of breath,

and just exhausted, and basically in pain. So, I believe I talked to the director
at the time and just told her I couldn't do it anymore.

(Tr. 39-40). Renschler's attorney also asked Renschler about her perception of her lupus-related

symptoms from 1999 to 2008:

> Q. [Was there] anything different about your condition in 1999 than there was
> in 2008 except that they actually had the right name for it?

> A. I was pregnant.

> Q. Yeah, in 1999, you were pregnant, okay. But I'm just – apart from the
> pregnancy, was there anything about your symptoms that were diagnosed in
> 2008 as being lupus, that were different in – or, in 1999? Or, were they the
> same symptoms?

> A. They were basically the same, only they steadily got worse every – and there
> were more and more.

> Q. When, when you say, and there were more and more, what, what more and
> more symptoms – again, keeping in mind that your date last insured is 2001,
> were all of the symptoms that you have today in existence prior to March 31,
> 2001?

> A. I would say so, yes.

(Tr. 40-41). Renschler's attorney also asked Renschler a number of questions about her medical

records post-dating her date last insured and about her various limitations and medical problems

both before and after her date last insured. (Tr. 45-55).

Renschler's mother was also examined by Renschler's attorney and described her impression

of the changes in Renschler's conditions as follows:

> Q. And would you say that her condition prior to March 31 of 2001 was
> essentially the same types of symptoms she's experiencing now, in terms of
> the fatigue, and the feet, and, and those – the upper respiratory, those kinds
> of things?

> A. Well, I, I guess, I guess so. I, I mean, in the last – I'd have to say, the last
> three years, we've seen more and more. I mean–

Q.     Right.

A.     – more and more has developed.  But yeah, pretty much, you know, the same complaints of extreme fatigue, and pain in her hands, and pain in her feet, and not being able to, you know, do as much as she could.  It seemed like she was constantly on an antibiotic for upper respiratory, that she just never, ever seemed to get better.  Lots of –.

Q.     What kinds of changes do you see in her from what she was like, say, back in 1999?

A.     Oh, gosh.  I see physical changes, of course.  Mental changes, emotional changes?  I mean, she's very frustrated, you know.  I guess we both are.  Because it just seems like there's no answers.  There's no treatment that's working.  I mean, she's on multiple meds, but it just seems like nothing really meshes to get the problem under control, and she's developed more and more problems, you know.  As a result, she's, you know, developed hypertension, she has hypothyroid, she's very anemic, she's – you know, the fatigue is ongoing.

(Tr. 59-60).

Following the hearing, the ALJ issued a written decision finding that between her alleged onset date and her date last insured, Renschler was not disabled within the meaning of the Social Security Act.  (Tr. 13).  The ALJ outlined and followed the required five-step sequential analysis for determining whether a claimant is disabled.  (Tr. 14-15).  At step one, the ALJ found that Renschler did not engage in substantial gainful activity during the relevant period.  (Tr. 15).  At step two, the ALJ identified Renschler's medically determinable impairments as a history of headaches, hypertension, and obesity and determined that Renschler's symptoms associated with SLE and depression did not limit her ability to work prior to her date last insured.  (Tr. 15-16).  The ALJ found that the identified impairments did not amount to "an impairment or combination of impairments that even minimally limited her ability to perform basic work activities[.]"  (Tr. 16).  Having determined that Renschler failed to meet the step-two requirements, the ALJ concluded that

Renschler was not under a disability during the relevant time and did not proceed to the subsequent steps.

## II.     GOVERNING LAW

### A.     Standard of review

This court's review of the Commissioner's decision is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010); Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). In reviewing the Commissioner's decision, the court must consider the entire record, including information unfavorable to the Commissioner's decision. Id. The court must defer to the ALJ's credibility determinations "so long as they are supported by good reasons and substantial evidence." Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006) (quoting Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005)). If substantial evidence supports the Commissioner's decision, the court must affirm, even if substantial evidence would have supported another outcome and the court would have decided the case differently. Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006).

### B.     Law governing availability of DIB

To qualify for DIB, a claimant must establish the existence of a disability on or before the date the claimant's insured status expired. See 42 U.S.C. § 423; McCoy v. Astrue, 648 F.3d 605, 608 (8th Cir. 2011) (citing Tilley v. Astrue, 580 F.3d 675, 676 (8th Cir. 2009), for the proposition that the relevant inquiry is whether the claimant was disabled between the alleged onset date and the

date last insured). Under the Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ must follow the sequential five-step process mandated by 20 C.F.R. § 404.1520(a)(4). <u>Goff v. Barnhart</u>, 421 F.3d 785, 790 (8th Cir. 2005). The five steps include determining (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the impairment meets or is medically equivalent to a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform past relevant work; and (5) whether the impairment prevents the claimant from doing any other work. 20 C.F.R. 404.1520(a)(4); <u>Goff</u>, 421 F.3d at 790. If the ALJ determines the claimant fails to meet the disability criteria at any step, the claimant is determined not disabled, and subsequent steps need not be considered. 20 C.F.R. 404.1520(a)(4); <u>Goff</u>, 421 F.3d at 790. The claimant has the burden of proving the first four steps. <u>Goff</u>, 421 F.3d at 790. If the process proceeds to the fifth step, the burden shifts to the Commissioner to prove the availability of other jobs the claimant can perform. <u>Id.</u>

**C.** **<u>Law governing step-two analysis</u>**

The ALJ determined that Renschler failed to make the step-two showing of a severe impairment that significantly limited her ability to perform basic work activities. Basic work activities include the ability to perform physical functions such as walking, standing, sitting, lifting,

pushing, pulling, reaching, carrying, or handling; to see, hear, and speak; to understand, carry out, and remember simple instructions; to use judgment; to respond appropriately to supervision, co-workers and usual work situations; and to deal with changes in a routine work setting. 20 C.F.R. § 404.1521(b). Whether a severe impairment exists is to be determined without consideration of the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(c).

A claimant's burden at step-two is not onerous. Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)). Step-two dismissal is justified only for "those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995) (quoting Bowen v. Yuckert, 482 U.S. 137, 153 (1987)).

## III.    THE MOTIONS FOR SUMMARY JUDGMENT

Renschler argues that the Commissioner's findings were not supported by substantial evidence and that the Commissioner failed to apply the correct legal standards for several reasons. Renschler does not dispute that her insured status under the Act expired on March 31, 2001.

### A.    Renschler's arguments relating to the ALJ's treatment of her medical records and her SLE diagnosis

Renschler argues that the ALJ erred by determining her SLE was not a severe medically determinable impairment prior to her date last insured. She asserts her medical records show that, although she was not officially diagnosed with SLE until 2008, her SLE-related symptoms limited her ability to work long before her diagnosis. She asserts that the ALJ erred by refusing to consider

the medical evidence post-dating her date last insured.

To qualify for DIB, Renschler was required to show that she was disabled before her insured status expired. The ALJ was permitted to rely on Renschler's medical records from outside her insured period only to the extent that they "help[ed] to elucidate a medical condition during the time for which benefits might be rewarded." Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (quoting Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir.1998)). Medical evidence from outside the insured period "is required to pertain to the time period for which benefits are sought and cannot concern subsequent deterioration of a previous condition." Moore v. Astrue, 572 F.3d 520, 525 (8th Cir. 2009).

Renschler's assertion that the ALJ refused to consider any medical evidence post-dating her date last insured mischaracterizes the ALJ's treatment of the record. Both the ALJ's questions during the administrative hearing and his written decision illustrate that the ALJ had reviewed all of the available medical records. In fact, ALJ's written opinion specifically notes that "the claimant's medical records after her date last insured help to illuminate her functioning prior to her date last insured" and proceeds to discuss in detail why the medical records do not support a finding that Renschler was unable to work due to her SLE before her insured status expired. (Tr. 19). In addition, the ALJ permitted Renschler's attorney to ask her a number of questions about her treatment following her date last insured.

The ALJ's determination that Renschler's subsequent medical records did not show that her SLE-related symptoms were medically determinable impairments during the relevant period was not erroneous. As noted in the ALJ's opinion and illustrated by the discussion of Renschler's medical records above, Renschler's medical history prior to her date last insured was sparse. Renschler

sought medical treatment only twice between her alleged onset date and her date last insured, once for breast tenderness and once for an annual exam. The first note of Renschler complaining of fatigue and aches and pains was in May 2002, more than a year after her insurance coverage expired. In subsequent years, Renschler continued to report fatigue and pain in her joints and sought treatment more frequently over time. The medical records are consistent with the testimony of Renschler and her mother, which suggested that Renschler's condition had deteriorated over time. The ALJ's determination that Renschler's SLE-related symptoms, including severe fatigue and pain in her hands and feet, were not medically determinable impairments prior to her date last insured was supported by substantial evidence.

**B.    Renschler's arguments relating to the ALJ's credibility determinations**

Renschler argues that the ALJ improperly discounted her testimony that she was unable to work due to her subjective SLE-related symptoms before her insured status expired. She argues that the ALJ failed to apply the correct legal standard when evaluating her credibility and that the ALJ improperly rejected her testimony relating to her subjective complaints, which was supported by the medical evidence in the record.

An ALJ rejecting a claimant's subjective complaints must make an express credibility determination and explain the reasoning for discrediting the complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007). Courts generally defer to the ALJ's credibility determination, provided that the ALJ explicitly discredits the claimant's complaints and gives good reason for doing so. Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010).

The Eighth Circuit outlined the standard for evaluating a claimant's allegations of pain and other subjective complaints in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). Under Polaski,

the ALJ "may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them" and is also "not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations." 739 F.2d at 1322 (emphasis in original). Rather, the ALJ must consider all the evidence relating to a claimant's subjective complaints including "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; [and] 5. functional restrictions." Id. The ALJ is not required to explicitly discuss each Polaski factor. Wagner, 499 F.3d at 851.

The ALJ's written decision included the following findings regarding Renschler's testimony about her subjective symptoms prior to her date last insured:

> [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the claimant had no severe impairment or combination of impairments. . . . In making this determination, the undersigned has considered the entire case record; including, the objective medical evidence, the claimant's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the claimant, and any other relevant evidence in the case. Evidence that the undersigned found particularly probative on this issue includes the following: (1) the claimant's activities of daily living were not consistent with the presence of severe impairments; (2) the claimant allegations regarding the intensity, persistence, and limiting effects of her impairments, during the period at issue, are not consistent with the medical evidence of record; and (3) the claimant does not have a solid work history that adds credence to her claim of being disabled.

(Tr. 17-18). The ALJ then detailed why the three factors supported the finding that Renschler did not have a severe impairment as of her date last insured. (Tr. 18-20).

The ALJ made a specific finding regarding Renschler's credibility and explained the reasoning for his finding. The explanation included a detailed discussion of a number of factors

identified in <u>Polaski</u>, and the reasons the ALJ provided were supported by the evidence in the record. Further, as noted above, the ALJ's determination that Renschler's subjective allegations were not consistent with the medical evidence was supported by the record.  <u>See</u> <u>Gwathney v. Chater</u>, 104 F.3d 1043, 1045 (8th Cir. 1997) (stating that failure to seek medical treatment for alleged impairments contradicts claimant's subjective complaints); <u>cf.</u> 20 C.F.R. § 404.1508 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" )  The ALJ properly discredited Renschler's testimony that her impairments significantly limited her ability to work prior to her date last insured, and the court will defer to the ALJ's credibility determination.

### C. <u>Renschler's argument that her due process rights were violated</u>

Renschler argues she was denied a fair hearing in violation of her right to due process because she "was not placed on notice through the notice of hearing from the Commissioner that the claimant was to prepare to argue the issue of 'date last insured' instead of the merits of her condition, for which she had medical and objective proof."  In addition, regarding the medical evidence post-dating her date last insured, she argues that she was not given notice "that most of her medical evidence would be disallowed for technical, not medical reasons."

A disability claimant is entitled to a "full and fair" hearing under the Act and under the Due Process Clause of the Fifth Amendment.  <u>Hepp v. Astrue</u>, 511 F.3d 798, 804 (8th Cir. 2008).  "The Due Process Clause of the Fifth Amendment requires that, before property can be taken, notice and an opportunity for a hearing be provided."[1]  <u>Wilburn v. Astrue</u>, 626 F.3d 999, 1002 (8th Cir. 2010)

---

[1] The Eighth Circuit, relying on the United States Supreme Court's decision in <u>Richardson v. Perales</u>, 402 U.S. 389, 401-02 (1971), has assumed that due process applies to Social Security disability hearings without determining whether the applicant has a property interest in the benefits.  <u>E.g.</u>, <u>Wilburn</u>, 626 F.3d at 1002 n. 2;  <u>Hepp</u>, 511 F.3d at 804 n.5.

(quoting Baldwin v. Credit Based Asset Servicing and Securitization, 516 F.3d 734, 737 (8th Cir.2008)).  "Adequate notice is that which is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  Wilburn, 626 F.3d at 1003 (quoting Bliek v. Palmer, 102 F.3d 1472, 1475 (8th Cir. 1997)).

The court need not consider whether the Commissioner's failure to identify Renschler's date last insured and explicitly inform Renschler that she must show she was disabled prior to that date would have violated her procedural due process rights, because the record shows that Renschler received such notice multiple times throughout the process.  The notices Renschler received denying her claim initially and upon review stated, "We have determined that your condition was not disabling on any date through March 31, 2001, when you were last insured for disability benefits." (Tr. 69, 74).  The notice sent by the ALJ prior to the administrative hearing also identified the issue, stating, "I will also consider whether you have enough earnings under Social Security to be insured for a Period of Disability and Disability Insurance Benefits.  If you do, I must decide whether you became disabled while you were insured."  (Tr. 90).  Further, the following exchange occurred between the ALJ and Renschler's counsel near the beginning of the administrative hearing:

> ALJ: Now, Ms. Carpenter, I understand you're brand new to this case, or are fairly new.
>
> ATTY: Yeah.  We've just gotten the Notice of Representation filed, but I have had an opportunity to talk with her regarding the issues, most notably, the date last insured issues, when she first came to see me. We focused–
>
> ALJ: All right.
>
> ATTY: –on that, primarily, first.

| ALJ: | Okay. Well, as you know, the date last insured is March 31 of 2001. |
|---|---|
| ATTY: | Yes. |
| ALJ: | Consequently, your client needs to show to me that she was disabled on or before that date, okay? |
| ATTY: | Yes. |
| ALJ: | The only evidence that I have available, medical evidence that I have available, that encompasses that period of time, is contained in Exhibit 6F of the record. So, for purposes of this hearing, we're going to focus on those dates only. Doesn't, doesn't matter if she's disabled now if she doesn't show that she was disabled back then. Understand that? |
| ATTY: | That is correct. |
| ALJ: | Okay. Any opening statement? |
| ATTY: | Just that the issue as identified both in the prehearing notice and on the record here today is that she has to show that she was operating under a disability, or was disabled on or before March 31 of 2001. . . . |

(Tr. 25-26). The record does not support Renschler's assertion that she was not provided notice of the date last insured issue. Further, to the extent that Renschler argues her due process rights were violated because she was not provided notice that the ALJ would not consider medical evidence post-dating her date last insured, her argument fails because, as discussed above, the ALJ did consider all the medical evidence in the record.

### D.     Renschler's argument that the ALJ erred by failing to call a Vocational Expert

Renschler argues that the ALJ's failure to call a Vocational Expert was reversible error. She further asserts that the ALJ's written decision erroneously states that a vocational expert appeared and testified at the hearing, when in fact, the Vocation Expert was available by telephone but did not testify.

An ALJ may be required to rely on a vocational expert's testimony when determining whether a disability claimant satisfies the final step of the five-step sequential evaluation process. See, e.g., Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996); Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993). However, when in applying the five-step process, the ALJ determines the claimant fails to meet the requirements of one step, the ALJ need not continue to the subsequent steps. 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step."); e.g., Goff, 421 F.3d at 790.

In this case, the ALJ determined that Renschler failed to meet the requirements of step two. As discussed above, that conclusion was supported by substantial evidence. Accordingly, testimony by a vocation expert was not required. Further, although Renschler correctly asserts that the ALJ's written decision erroneously states that a vocational expert appeared and testified, that misstatement of fact amounts to nothing more than a typographical error and in no way suggests that the ALJ's decision was not supported by substantial evidence.

## IV.    CONCLUSION AND ORDER

For the reasons stated above, Renschler's Motion for Summary Judgment (Docket No. 14) is **DENIED**; the Commissioner's Motion for Summary Judgment (Docket No. 16) is **GRANTED**; and the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Dated this 13th day of March, 2014.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court